**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**CENTRAL DIVISION**

| | |
|---|---|
| In re: <br><br> ARCADIA ENTERPRISES, INC. <br><br> Debtor. | Chapter 11 <br> Case No. 10-40226-MSH |

**MEMORANDUM OF DECISION ON MOTION FOR RELIEF FROM STAY**

This matter came before me for hearing on the Motion for Relief from Stay of Scituate Federal Savings Bank (the "Bank") [#51], the Debtor's opposition thereto [#52], the Bank's reply to the Debtor's opposition [#58], and the Debtor's supplemental opposition [#59]. Following the hearing the parties submitted additional memoranda of law [#61, by the Bank, and #70, by the Debtor]. The primary issue in dispute in this matter is whether the Debtor retains an ownership interest in certain project documents and attendant rights in connection with plans to develop a residential subdivision in Franklin and Bellingham, Massachusetts known as the Woodlands. The Bank asserts ownership of these documents. If the Debtor is found to retain an ownership interest in these items, the Bank seeks relief from stay so that it may exercise its rights with respect thereto.

**Facts**

Except as noted, the facts are largely undisputed. Citations are to documents attached to the various pleadings submitted by the parties. Neither party has challenged the authenticity of those documents, although they disagree as to what inferences and conclusions I may draw from them.

In 2000 The Pentad Group Trust ("Pentad") applied to the Town of Franklin for a

comprehensive permit under the Comprehensive Permit Act, Mass. Gen. Laws ch. 40B, §§ 20-23, to develop the Woodlands, a subdivision of sixteen detached single-family units (four of which were to be affordable housing units) and related infrastructure (the "Woodlands Project"), on land zoned for industrial use and located in the Towns of Franklin and Bellingham.[1] On October 26, 2000, the Town of Franklin Zoning Board of Appeals issued its decision granting the application and a comprehensive permit issued. At some point the Debtor joined Pentad as a project sponsor for the Woodlands Project.

In addition to the Comprehensive Permit, the development of the Woodlands Project is subject to a Local Initiative Program Regulatory Agreement and Declaration of Restrictive Covenants for Ownership Project (the "Regulatory Agreement"), dated November 9, 2004, and executed by the Debtor, the trustee of Pentad, the Town of Franklin, and the Massachusetts Department of Housing and Community Development (the "DHCD").[2] The Regulatory Agreement provides that the Regulatory Agreement and the covenants, agreements, and

---

[1]The Woodlands Comprehensive Permit Decision, dated October 26, 2000, is attached as Exhibit 6 to the Motion for Relief. Although the parties refer to the location of the Woodlands as Franklin, Massachusetts, documents, such as the Woodlands Comprehensive Permit Decision, indicate that a portion of the Woodlands is actually in Bellingham, Massachusetts. <u>See also</u> the deeds to purchasers of some of the lots, attached as Exhibit 1 to the Bank's Memorandum [#61].

[2]The Regulatory Agreement is attached as Exhibit 7 to the Motion for Relief and as Exhibit 2 to the Debtor's opposition [#52]. The Bank has represented that the pages of those copies of the Regulatory Agreement were reproduced in the same order in which the Regulatory Agreement was recorded in the Norfolk County Registry of Deeds and that those pages are out of order, interspersing pages from the sample Affordable Unit Deed Rider that was intended as an attachment to the Regulatory Agreement with pages of the Regulatory Agreement itself. Although the Debtor claimed insufficient information to admit or deny the Bank's representation, I accept the Bank's representation as accurate. Pages of the Regulatory Agreement bear the letters "RA" before each page number while pages of the sample Affordable Unit Deed Rider are labeled "DR." Moreover it is clear from an examination of the document that the pages reproduced in the order in which they were recorded are out of sequence.

restrictions in the Regulatory Agreement are not personal covenants of the Debtor and Pentad but rather are covenants that run with the land.[3]

At some point prior to February 9, 2005, Pentad sought permission from the Town of Franklin and the DHCD to transfer its ownership interest in the Woodlands Project to the Debtor, and the Debtor sought permission from the Town and the DHCD to obtain construction financing for the Woodlands Project from Walpole Cooperative Bank ("Walpole"). By letter dated January 20, 2005, the DHCD approved the transfer of ownership of the Woodlands Project to the Debtor and the Debtor's proposed construction loan from Walpole, subject to the parties' also obtaining approval from the Town of Franklin.[4] The DHCD letter also stated, however, that both Pentad and the Debtor continued to be responsible for the obligations imposed by the Regulatory Agreement. On February 9, 2005 the Town of Franklin, by Resolution 05-09, also approved both the transfer of the ownership of the Woodlands Project from Pentad to the Debtor and the construction financing between the Debtor and Walpole.[5] The Debtor asserts that Pentad is still a project sponsor and co-owns, with the Debtor, all the licenses, permits, approvals, and other project documents, including the Comprehensive Permit and the Regulatory Agreement (hereinafter collectively the "Project Documents"). The Bank has not addressed what interests, if any, Pentad continues to own, although, as will be elaborated upon below, Pentad's status does not affect the outcome of this matter vis a vis the Debtor..

---

[3]Regulatory Agreement at ¶15(b).

[4]Exhibit 9 to the Motion for Relief. Paragraph 11 of the Regulatory Agreement requires approval of the DHCD and the Town of Franklin for the sale, transfer, lease, exchange, or mortgaging of the Woodlands Project other than the sale of the housing units to homebuyers.

[5]*Id.*

In order to finance the Woodlands Project, the Debtor borrowed $1,920,000 from Walpole pursuant to two separate notes, both dated February 22, 2005 (the "February 2005 Notes").[6] To secure its obligations under the February 2005 Notes, the Debtor executed a Construction Mortgage, Security Agreement, and Assignment granting Walpole a mortgage on the Woodlands real estate and a security interest in certain personalty, including:

> All easements, covenants, agreements, declarant's or developer's rights and other rights which are appurtenant to or benefit the [Woodlands Project and]
>
> All contracts and agreements (together with the easements, covenants, agreements, and rights referred to in Section 3-3(c), above, and … licenses, regulatory agreements, comprehensive permits, permits and approvals (hereinafter the "Licenses")….[7]

The Debtor also executed a document titled "Collateral Assignment of Interest in Project Documents, Licenses, Permits, and Agreements", dated February 22, 2005 (the "Collateral Assignment"), by which it granted to Walpole a security interest in all of the Debtor's right, title and interest in and to the "Project Documents, Licenses and Rights," defined as:

> any and all of the project documents, licenses, permits, contracts, contract rights, warranties, development rights, agreements, consents and approvals, whether heretofore or hereafter issued or executed, by and between [the Debtor] and all boards, agencies, departments, governmental or otherwise (hereinafter referred to as "Governmental Authorities") or other persons or entities, relating, directly or indirectly, to the [Woodlands] or any part thereof, including, without limitation, [the Debtors'] right, title and interest in any and all agreements (collectively, the "Project Documents, Licenses and Rights) as set forth on Exhibit A attached hereto and made a part hereof.[8]

---

[6]Exhibit 1 to the Motion for Relief.

[7] Construction Mortgage, Security Agreement, and Assignment, attached as Exhibit 2 to the Motion for Relief, at §§ 3-3(c) and (g).

[8]Exhibit 3 to the Motion for Relief.

Exhibit A to the Collateral Assignment reads as follows:

> List of Licenses, Permits, Contracts, Contract Rights, Warranties, Development Rights, Agreements, Consents, and Approvals
>
> All federal, state and local governmental permits, licenses, consents and approvals relating to the development, construction use, occupancy, and operation of the [Woodlands], including, without limitation, all regulatory agreements, comprehensive permits, building permits, site plan and subdivision approvals, zoning permits, wetland permits and approvals, traffic permits, variances and special permits.

The Collateral Assignment permitted the Debtor to exercise the rights arising from the foregoing as long as the loans were not in default but upon default Walpole could

> without notice or demand, elect to exercise any and all of [the Debtor's] rights and remedies under any of the Project Documents, Licenses, Permits, and Rights, without any interference or objection of the [Debtor]. In any such event, [Walpole] may without demand, with or without entry upon the [Woodlands], at its option, take over and enjoy the benefits of the Project Documents, Licenses, and Rights, to the same extent [the Debtor] might do. [Walpole] may in connection with any of the foregoing powers, and without limiting the same, effect new Project Documents, Licenses, and Rights, cancel or surrender existing Project Documents, Licenses, and Rights, alter and amend the terms of and renew existing Project Documents, Licenses, and Rights, and make concessions to all or any of the Governmental Authorities or other parties in its sole, fettered discretion, and [the Debtor] hereby irrevocably appoints [Walpole] as its attorney in fact, coupled with an interest, to do all acts pertaining thereto in [the Debtor's] place and stead.[9]

Walpole recorded its mortgage and filed a Uniform Commercial Code financing statement with respect to the personal property collateral, including the Project Documents. By a purchase and sale agreement, dated November 30, 2006, Walpole sold to the Bank the February 2005 Notes, the Mortgage, and "[a]ll documents in [Walpole's] possession pertaining to the

---

[9]Collateral Assignment at ¶ 4.

[February 2005 Notes]."[10] Walpole also executed a document titled "Assignment" whereby it assigned the real estate mortgage to the Bank.[11] In March 2008 Walpole filed a termination of its financing statement.[12] The Bank never filed a financing statement with respect to any of the personal property collateral.

On February 5, 2009, as a result of a default,[13] the Bank conducted an expedited foreclosure sale of the Woodlands real estate. The Bank was the successful, indeed the only, bidder at the foreclosure sale.

---

[10]Exhibit 4 to the Bank's Memorandum [#61].

[11]Exhibit 4 to the Motion for Relief.

[12]Exhibit 10 to the Debtor's opposition [#52].

[13]The Debtor characterizes its default as "technical," arising from what it describes as an "erroneous" tax lien placed on the Woodlands, but does not challenge the Bank's *right* to conduct a foreclosure upon that default. The Release of Tax Lien, attached as Exhibit 7 to the Debtor's opposition [#52], indicates that the lien by the Internal Revenue Service against the Debtor, was recorded on October 21, 2008 and related to approximately $1.9 million of allegedly unpaid taxes. The lien was released on June 3, 2009. As discussed infra, the Debtor questions the validity of the foreclosure sale for other reasons.

In addition to the default arising from the tax lien, there appears to have been a payment default but perhaps with respect to different notes. The Bank's letter of November 26, 2008 to the Debtor, attached as Exhibit 8 to Debtor's opposition [#52], states that there has been a default arising from two missed payments but the letter references both the February 2005 Notes and a Commercial Promissory Note and Mortgage and Security Agreements dated March 6, 2006, December 28, 2006, and July 14, 2008 and states that the Commercial Promissory Note is in default as well. The Commercial Promissory Note and Mortgage and Security Agreements dated March 6, 2006, December 28, 2006, and July 14, 2008 are not mentioned in the Motion for Relief presently before me. Taking judicial notice of the docket in this case, I note that the Bank filed a motion for relief with respect to property located in Hopedale, Massachusetts and owned by the Debtor. The mortgages for the Woodlands and the Hopedale property are not cross-collateralized. It is unclear from the Bank's letter to which loans the missed payments are attributable but the Debtor does not dispute that a default occurred, albeit "technical" according to the Debtor. It is irrelevant to my findings whether the default occurred as a result of the tax lien or the missed payments or both.

The Bank contends that at the time of the foreclosure the infrastructure for the Woodlands Project was substantially complete, with only "punch-list" work remaining, and that seven houses had been built and all seven sold.[14] Following the foreclosure sale, Edward McLaughlin, a building contractor, applied for and received a building permit on behalf of the Bank to complete construction of the eighth of the sixteen approved units. This eighth unit was completed during the spring of 2009 and was sold in July 2009.[15] In November 2009 the Bank, through the Debtor's principal, obtained a Notice of Finding from the Town of Franklin as to the adequacy of the street lighting for the Woodlands Project.[16]

On January 21, 2010 (the "Petition Date") the Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. Although the Debtor did not schedule the Woodlands real estate as an asset,[17] it listed the Regulatory Agreement as a contingent claim of unknown value on Schedule B.

After the Petition Date, the Bank applied for and received a building permit to construct the ninth unit at the Woodlands. The Debtor, however, successfully appealed the issuance of that building permit.[18]

---

[14]Affidavit of Edward McLaughlin, attached as Exhibit 3 to the Debtor's Memorandum [#61], at ¶¶ 5 and 6.

[15]Exhibit 2 to the Bank's Memorandum [#61] and McLaughlin Affidavit.

[16]Exhibit 3 to the Debtor's opposition [#52].

[17]In its Statement of Financial Affairs, it describes the property sold at foreclosure by the Bank as "Woodlands Subdivision-Stonehedge Road, Franklin, Massachusetts."

[18]Exhibit 4 to the Debtor's opposition [#51] is the Debtor and Pentad's request for a hearing on their appeal of the issuance of the building permit. Exhibit 5 is their Executive Summary of the appeal. The crux of the Debtor and Pentad's appeal was that the Bank had not complied with the terms of the Comprehensive Permit because it had not paid a $2,500 school

By letter dated May 3, 2010, the Bank requested the Town of Franklin Zoning Board of Appeals to authorize the transfer of the Comprehensive Permit, which the Debtor did not schedule as an asset on the Debtor's Schedule B, to the Bank.[19] The Bank has represented that it drafted the May 3, 2010 letter at the request and direction of Franklin town counsel.[20] The Bank also represented that shortly before the hearing on the request to transfer the Comprehensive Permit to the Bank's name, the Debtor's counsel informed the attorney for the Bank that the Debtor was asserting an ownership interest in the Comprehensive Permit, whereupon the Bank withdrew its request to transfer the Permit.[21] The Bank then filed its Motion for Relief seeking a ruling that the Debtor does not have any ownership interest in the Woodlands Project or the Project Documents,[22] or alternatively granting the Bank such relief pursuant to 11 U.S.C. § 362(d)(2) as is necessary to permit the Bank to complete the Woodlands Project.

**Position of the Parties**

The Bank argues that pursuant to the Collateral Assignment, upon the Debtor's default, it succeeded to all rights and benefits under the Project Documents, and furthermore, that the

---

Capital Fund Donation that was to be made prior to the issuance of a building permit for a unit that was not designated as an affordable unit and the Bank was not a limited dividend income entity. The Executive Summary, which the Debtor submitted to the Town Zoning Board of Appeals, notes that the Bank is the owner of the real estate and does not challenge the Bank's ownership.

[19]Exhibit 1 to the Debtor's opposition [#51].

[20]Motion for Relief at note 1.

[21]Motion for Relief at ¶¶ 22 and 23.

[22]Neither party has raised the propriety of seeking such relief outside of an adversary proceeding. See Fed. R. Bankr. P. 7001. Instead, they argue the issue of whether the Project Documents are property of the estate in the context of the Motion. Therefore, I will address the question.

foreclosure sale of the real estate cut off the Debtor's rights under the Project Documents because the Project Documents run with the land, first because the Regulatory Agreement expressly states that they do, and second because the rights and obligations reflected in the Project Documents are so intimately connected to the land. The Bank maintains that the Regulatory Agreement and Comprehensive Permit are of no value to anyone without the real estate. Finally, the Bank notes that it was forced to file its motion for relief from stay in response to the Debtor's accusation that the Bank had violated the automatic stay by attempting to exercise control over the Woodlands Project, including by seeking to have the Comprehensive Permit transferred to its name.

The Debtor counters by arguing that the Project Documents are personal property and that Walpole assigned to the Bank the real estate mortgage only, not its security interest in personal property. The Debtor also argues that even if the Bank had a security interest in the Project Documents, the Bank did not exercise its secured party rights with respect to the Project Documents prior to the Petition Date and that the Bank's attempt to obtain a transfer of the Comprehensive Permit was thus a wilful violation of the automatic stay. The Debtor cites the fact that the Bank requested the Debtor to obtain the Notice of Finding with respect to the subdivision's lighting requirements as evidence that the Bank recognized that the Debtor, not the Bank, continued to own the Project Documents post-foreclosure. The Debtor further contends that the Bank's failure to give the Town of Franklin and the DHCD at least 60 days' notice of the foreclosure sale and the opportunity to exercise a right of first refusal, as required by the Regulatory Agreement, invalidates the foreclosure sale. The Debtor also argues that the Bank failed to obtain written confirmation from the Town of Franklin or the DHCD that the Bank met

the eligibility requirements to become a transferee of the Comprehensive Permit and that, indeed, the Bank cannot possibly meet those requirements because it is not a limited dividend organization as required by the Comprehensive Permit Act and 760 Mass. Code Regs. § 56.04(1)(a)-(c). Finally, the Debtor argues that the Bank's failure to pay a $2,500 school capital facility donation prior to Mr. McLaughlin's application for a building permit to build the eighth Woodlands unit evidences the Bank's noncompliance with the Comprehensive Permit.[23] Therefore, the Debtor concludes, the Bank cannot proceed with the development of the Woodlands Project and it is the Debtor, in a possible joint venture with Pentad, which will attempt to complete the development. Tellingly, however, at oral argument the Debtor conceded that even if it retains an interest in the Project Documents, it cannot compel the Bank to allow it to build on the Woodlands real estate.

Regarding the Debtor's assertion that the foreclosure sale was invalid, the Bank responds by acknowledging that it did not provide advance notice of the foreclosure sale to the Town or the DHCD because such notice was required *only* if the Bank was seeking to free the Woodlands Project from the restrictions imposed by the Comprehensive Permit Act, which it was not. Regarding the right of first refusal, the Bank submits that such right is not triggered by the foreclosure sale process. Rather it is found in the sample affordable unit deed rider attached to the Regulatory Agreement, and thus the right of first refusal is a right of the Town or DHCD to purchase an affordable housing unit from the *homeowner*, if such homeowner intends to sell his unit.

With respect to the Comprehensive Permit Act, the Bank argues that it has agreed to limit

[23] See Comprehensive Permit at ¶ 2(i).

its dividend but in any event it is eligible to seek a waiver of the Act's requirements. Finally, the Bank notes that it is the Debtor which can no longer satisfy the jurisdictional requirements of the Act and the regulations promulgated thereunder as it no longer owns the Woodlands real estate.

**Discussion**

A hearing on a stay relief motion is a summary proceeding. When rights in property are in dispute, a court need only determine "whether the party seeking relief has a colorable claim to property of the estate." Grella v. Salem Five Cent Sav. Bank, 42 F.3d 26, 33 (1st Cir. 1994). Summary proceedings should afford creditors fair notice and an opportunity to be heard and permit parties to present evidence when the facts are in dispute and to make arguments regarding those facts. U.S. v. Fairway Capital Corp,. 433 F. Supp.2d 226, 241 (D.R.I. 2006). Neither party has requested an evidentiary hearing and the pertinent facts do not appear to be in dispute. Both parties have extensively briefed the issues and the motion is thus appropriate for disposition.

**The Comprehensive Permit Act and The Project Documents**

The Comprehensive Permit Act, sometimes referred to as the anti-snob zoning act, was designed to facilitate the construction of low or moderate income housing by restricting local exclusionary zoning practices. Zoning Bd. of Appeals of Wellesley v. Ardemore Apartments Ltd. Partnership, 436 Mass. 811, 814, 767 N.E.2d 584 (2002). "A key aspect of the Act's framework is the requirement that each municipality devote ten per cent of its housing units to low or moderate income housing." Taylor v. Housing Appeals Comm., 451 Mass. 149, 151, 883 N.E.2d 1222 (2008). To facilitate the construction of such housing, the Comprehensive Permit Act "streamlines the permitting process by allowing a developer . . . to file a single application

for a comprehensive permit with the local zoning board of appeals rather than seeking separate approval from each local board having jurisdiction over the project." Town of Hingham v. Department of Housing and Community Development, 451 Mass. 501, 502, 887 N.E.2d 231, 232 (2008) (internal citations and quotation marks omitted). In order to qualify for approval under the Comprehensive Permit Act, the applicant and the project must meet certain eligibility requirements set forth in 760 Mass. Code Regs. § 56.04 including:

> (1) Project Eligibility. To be eligible to submit an application to a Board for a Comprehensive Permit or to file or maintain an appeal before the [Housing Appeals] Committee, the Applicant and the Project shall fulfill, at a minimum, the following project eligibility requirements:
>
> (a) The Applicant shall be a public agency, a non-profit organization, or a Limited Dividend Organization;
>
> (b) The Project shall be fundable by a Subsidizing Agency under a Low or Moderate Income Housing subsidy program; and
>
> (c) The Applicant shall control the site.

760 Mass. Code Regs. § 56.05(12)(b) establishes the guidelines under which a comprehensive permit may be transferred as follows:

> Transfer of Permits. Prior to substantial completion of a Project or a phase thereof, a Comprehensive Permit may be transferred to a person or entity other than the Applicant, upon written confirmation from the Subsidizing Agency that the transferee meets the requirements of 760 C.M.R. 56.04(1)(a) and (b), and upon written notice to the Board and the Committee (in the case of a Project granted a Comprehensive Permit under 760 C.M.R. 56.07). Transfer of the permit shall not, by itself, constitute a substantial change pursuant to 760 C.M.R. 56.07(4). After substantial completion, a Comprehensive Permit shall be deemed to run with the land.

As the parties note, neither the statute nor the regulations define "substantial

completion." Pointing out that only 50% of the housing units at the Woodlands are complete, the Debtor urges that I look to other statutes where substantial completion is defined as requiring considerably more than 50% completion. As an example the Debtor cites Mass. Gen. Laws ch. 30, § 39G which deals with public contracts and is part of a detailed statutory scheme providing for a contractor and an awarding agency to reach agreement as to the completion and satisfactory nature of the work performed. That statute provides:

> Substantial completion, for the purposes of this section, shall mean *either* that the work required by the contract has been completed except for work having a contract price of less than one percent of the then adjusted total contract price, or substantially all of the work has been completed and opened to public use except for minor incomplete or unsatisfactory work items that do not materially impair the usefulness of the work required by the contract.

The Debtor also cites Mass. Gen. Laws ch. 260, § 2B, a statute of repose for damage claims arising from deficient or negligent design, planning, construction or administration of an improvement to real estate of a public agency, which provides that the statute of limitations shall run from the earlier of several actions, one of which is the "substantial completion of the work and the taking of possession for occupancy by the awarding authority." Finally, the Debtor urges reliance on Mass. Gen. Laws. ch. 254, § 2A, which deals with liens for work performed for the building, improvement or alteration of real property. That section defines substantial completion as the point when "work under the written contract is sufficiently complete so that it can be occupied or utilized for its intended use." Based on the three statutes, the Debtor argues that substantial completion requires that the "project has achieved a level of completion so substantial that the project can be utilized for its intended purpose with only minor incomplete items of work remaining which do not prevent the use and occupancy by the ultimate

purchaser/user."[24]

The three statutory definitions of substantial completion brought to bear by the Debtor do not support the Debtor's argument. Mass. Gen. Laws ch. 30, § 39G is aimed at the protection of the public fisc by ensuring that contractors are paid for work performed on publically-funded projects only after the work is virtually complete. Such an objective is not relevant to the development of affordable housing. Mass. Gen. Laws ch. 260, § 2B uses the phrase "substantial completion" but, like the regulation before me, does not define it although it implies it is a point prior to the time the property is occupied. Finally, Mass. Gen. Laws ch. 254, § 2A actually undercuts the Debtor's argument as the statute defines substantial completion as the taking of possession of the property for occupancy. Under that definition substantial completion of the Woodlands Project occurred after the sale and occupancy of the first housing unit.

The Bank, noting that the Woodlands' infrastructure is complete but for what are described as punch-list items and that half the housing units, including all four affordable homes, have been built and sold, suggests that the Woodlands Project is substantially complete within the meaning of the Comprehensive Permit Act and regulations. I find that the Bank's interpretation better advances the purpose and policy of the Act which is to ensure that transferees of comprehensive permits remain bound by the terms and conditions of those permits. This, in turn, supports the strong policy of ensuring that housing designated as affordable remains as such. This interpretation comports with the intent of the parties to the Regulatory Agreement which expressly provides that the covenants, restrictions and regulations in the Regulatory Agreement run with the land unless the Town and the DCHC are given 60-

---

[24] Debtor's reply memorandum [#70] at pp. 8-9.

days notice of a foreclosure, which the Bank acknowledges it did not give because it had no intention of freeing itself from the Regulatory Agreement. The Comprehensive Permit is among the covenants, restrictions and regulations incorporated in the Regulatory Agreement.[25]

**Covenants Running with the Land**

Even if the Debtor's definition of substantial completion were adopted, general principles of Massachusetts real estate law would nevertheless mandate the conclusion that the Project Documents run with the land. The criteria for creating a covenant running with the land, at least as between fee owners, are well established:

> (i) the covenants must be evidenced in a writing signed by the covenantor...; (ii) the deeds must express the covenantor's intention that the covenants run with the land; (iii) the deeds must grant mutual easements sufficient to satisfy the requirement that the parties be in privity of estate; (iv) both the benefit and the burden of a real covenant must "touch and concern" the affected parcels of land.

Well-Built Homes, Inc. v. Shuster, 64 Mass. App. Ct. 619, 626-27, 834 N.E.2d 1213, 1219 -20 (2005) (footnotes and internal citations omitted). Privity is not required in instances such as the case at bar where the party against whom the restrictions would be sought, namely the Bank, has notice of the relevant restrictions. Id. at 626 n. 13, 834 N.E.2d at 1219 n. 13. The Regulatory Agreement satisfies the requirement that the covenant be in writing and signed by the covenantor

---

[25]Paragraph 1 of the Regulatory Agreement provides in part:

> The Project Sponsor agrees to construct the Project in accordance with plans ans specifications approved by the Municipality and DHCD (the "Plans and Specifications") [and in accordance with all terms and conditions of the Comprehensive Permit.]
> (Parentheses and brackets in the original).

and, although there is no deed between the covenantor on the one hand and the Town of Franklin and the DHCD on the other as this is not a situation of covenant between or among fee owners, the Regulatory Agreement expressly provides that it runs with the land. It permits the landowner to benefit by enjoying the right to build residential units in an industrially zoned area but burdens the landowner with the requirement that it comply with the terms of the agreement, including limiting its profit in connection with the project. In Well-Built Homes the Appeals Court determined that a covenant ran with the land because a separation agreement and deeds evidenced "a future uniform set of restrictions on development and usage of lots within the tract, and to retain the union between [the owner's] lots and the greater development for such purposes. The Covenant assures the orderly and mutually beneficial development of the entire area and is directed at planning goals which directly affect the actual physical enjoyment of the [ ] property." Id. at 627 n. 16, 834 N.Ed.2d at 1220 n. 16. Similarly the Project Documents in this case evidence the same intent of an "orderly and mutually beneficial development" affecting the physical enjoyment of the Woodlands real estate.

Accordingly I find that the Project Documents run with the land and thus, when the Bank purchased the Woodlands real estate at the foreclosure sale, it took title to the Project Documents along with the real estate.

**The Collateral Assignment**

The Bank argues that it stood in the place of the owner of the Project Documents by virtue of exercising its rights under the Collateral Assignment. The Debtor's argument that the Collateral Assignment was never actually assigned to the Bank by Walpole is conclusively refuted by the Purchase and Sale Agreement between Walpole and the Bank which expressly

states that Walpole's Collateral Assignment and Walpole's rights and interests under the Collateral Assignment were sold to the Bank. However, the Debtor submits that unless the Bank took steps to perfect its security interest in the personal property covered by the Collateral Assignment (which includes the Project Documents) upon purchasing it from Walpole, the security interest became unperfected when Walpole terminated its financing statement. Thus, if the Debtor retained rights in the Project Documents as of the Petition Date, then the Debtor, in its capacity as a hypothetical judgment lien creditor under Bankruptcy Code § 544(a)(1), will prime the Bank's security interest in the Project Documents.[26]

The Collateral Assignment provided that upon the Debtor's default, the Bank was free to take whatever action it chose with respect to the assigned property, including the Project Documents. Nothing in the Collateral Assignment requires the Bank to take any particular action in order to stand in the Debtor's shoes with respect to the Project Documents after a default. In fact the Collateral Assignment expressly provides that the Bank could exercise those rights without notice or demand, and without entry onto the land.

Additionally, the Project Documents are so profoundly intertwined with the Woodlands

---

[26]Section 544(a)(1) provides:

> The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such creditor exists.

real estate as to render their classification as personal property inapt. Since they run with the land, the Bank's exercising its secured party rights with respect to the real estate necessarily included the Project Documents. Thus the Bank became the owner of the Project Documents when it purchased the real estate pre-petition at the foreclosure sale. It is noteworthy that the Debtor does not dispute the fact that after the foreclosure sale, the Bank exercised the Bank's rights under the Project Documents by applying for a building permit to complete the eighth unit and that the Debtor did not challenge the issuance of this building permit.

**Notice, Pentad, the $2,500 Payment, and the Bank as a Limited Dividend Entity**

The Debtor's argument that the foreclosure sale is invalid as the Bank did not give the Town of Franklin and the DHCD at least 60 days' prior notice of the foreclosure sale is flawed. The documents require such advance notice if, and only if, the foreclosing party wishes to relieve itself from the burdens of the Regulatory Agreement. The Bank acknowledges that it did not give advance notice because it intended to take the real estate subject to the Regulatory Agreement.

The Debtor's argument that Pentad retains an interest in the Woodlands Project is unavailing. Pentad was not a signatory to any of the loan documents nor could it have been. It transferred its ownership interest in the Woodlands Project to the Debtor. That is why Pentad never sought approval to enter into the construction financing with Walpole. To the extent that Pentad believes it may have an interest in the Woodlands Project, Pentad, not the Debtor, would have standing to assert its claim in a court of competent jurisdiction. Besides, the question of what rights, if any, Pentad retains in the Project Documents has no impact on the question of what rights, if any, the Debtor retains in those documents.

The Bank's failure to make a $2,500 school capital facility donation for the building permit and the Bank's status or lack thereof as a limited dividend entity are matters to be sorted out among the Bank, the Town of Franklin and the DHCD. These concerns have no bearing on whether the Debtor retains any interest in the Project Documents.

**Value of the Property to the Estate**

Even if the Debtor retains some interest in the Project Documents, those documents are worthless to the estate without the Woodlands real estate which is now owned by the Bank. While the Debtor seemed to argue that the Project Documents have value independent of the real estate, it failed to offer a plausible scenario to illustrate such value. Indeed, the Debtor has conceded that it cannot compel the Bank to permit it to build any units on the Woodlands real estate.

**Conclusion**

For the foregoing reasons, I find that the Bank is the owner of the Project Documents and will allow the Motion for Relief to the extent necessary for the Bank to transfer the Comprehensive Permit to its own name, obtain building permits, and take any other actions as are necessary for the Bank to continue the Woodlands Project to final completion.

A separate order will issue.

Dated: October 27, 2010

Melvin S. Hoffman
United States Bankruptcy Judge